UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re JOSEPH T. DIMINO,                                            Chapter 7
                                                                   Case No. 807-71517-reg
                     Debtor.
---------------------------------------------------------x
ROBERT L. PRYOR, as Trustee of the Estate of
JOSEPH T. DIMINO,

                     Plaintiff,

          -against-
                                                                   Adv. Pro. No.: 08-08121-reg

JUSTIN FISHER and GARY DONNELLY,
Individually,

                     Defendants.
---------------------------------------------------------x

## MEMORANDUM DECISION

          This matter is before the Court pursuant to an adversary proceeding filed by Robert L.

Pryor, the Chapter 7 trustee (the "Trustee" or "Plaintiff") in the pending bankruptcy case of

Joseph T. Dimino (the "Debtor").  The Trustee seeks to recover two pre-petition transfers from

the Debtor to Justin Fisher ("Fisher") and Gary Donnelly ("Donnelly") (collectively, the

"Defendants") in the aggregate amount of $55,000 made in satisfaction of mechanic's liens the

Defendants filed against the Debtor's real property located in Orient Point, New York

("Property") and an additional pre-petition transfer by the Debtor to Fisher in the amount of

$10,000 (collectively, the "Prepetition Transfers").

          The Trustee asserts that the $55,000 transferred by the Debtor to the Defendants is

recoverable under 11 U.S.C. §§ 541, 544, and 548(a) and § 273 of the New York Debtor Creditor

Law ("DCL") because the transfers were made in satisfaction of mechanic's liens filed by the

Defendants on the Property which were legally deficient.  According to the Trustee, the

Defendants filed the mechanic's liens against the Property to gain leverage over the Debtor and force the Debtor to transfer the $55,000 for no consideration.   The Trustee argues that because there are no enforceable obligations underlying the mechanic's liens the Debtor never received fair consideration in exchange for the transfers.   The Trustee seeks to recover the additional $10,000 transferred by the Debtor to Fisher as a fraudulent conveyance because, *inter alia*, the Debtor was not legally indebted to Fisher for such amount.

With respect to the $55,000 transfers, the Court finds that although the mechanic's liens were legally deficient, the transfers are not recoverable under the theories advanced by the Trustee. The Court finds the Debtor received fair consideration in exchange for the transfers. Furthermore, there is no evidence that the Debtor's agreement to transfer the funds is void or vitiated as the product of duress.  For the reasons set forth below, the Debtor was legally indebted to the Defendants pursuant to a loan made by Fisher to the Debtor and based on materials purchased by Donnelly for the benefit of the Debtor.  The transfers made by the Debtor at the closing were made in consideration of these obligations.  The same is true for the additional $10,000 transferred by the Debtor to Fisher – the Debtor was legally obligated to Fisher to repay this amount and therefore the Debtor received fair consideration for that transfer as well.  As a result, the Trustee may not recover the Prepetition Transfers .

## *Procedural History*

On April 30, 2007 (the "Filing Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the Bankruptcy Code (the "Code").  The Trustee was appointed trustee of the Debtor's estate on May 1, 2007.  On October 3, 2007, the adjourned meeting of creditors was held pursuant to § 341(a) of the Code, at which time, the Trustee became the permanent trustee of the Debtor's estate.

The Trustee commenced this adversary proceeding against the Defendants on June 20, 2008. The Defendants each filed answers to the complaint on August 8, 2008 and August 11, 2008. On May 13, 2009, an amended complaint was filed by the Trustee. Thereafter, on July 6, 2009, the Trustee filed a motion for default judgment or, in the alternative, summary judgment against the Defendants. On July 20, 2009, the Defendants jointly filed an answer to the amended complaint denying the allegations in the complaint and filed opposition to the Trustee's motion for summary judgment. In addition, Donnelly asserted several affirmative defenses. The court denied the motion for default judgment and adjourned the motion for summary judgment to August 17, 2009. On August 17th the motion for summary judgment was adjourned until October 6, 2009, where the court held a hearing on the summary judgment motion and the motion was marked submitted. A trial was held on November 19, 2009 and thereafter, the Trustee submitted a post-trial brief.

*Facts*

In August 2000, the Debtor purchased the Property for approximately $90,000. At the time of the purchase, the Property was vacant and remained unimproved land for approximately three years. In early 2003, the Debtor approached Gary Donnelly, and discussed building a one-family home on the Property. The Debtor asked Donnelly to assist him with the construction. He approached Donnelly because of their long friendship and Donnelly's experience in construction. Donnelly, who was a postal worker by profession, was not licensed by either the Town of Southold or Suffolk County to conduct a home improvement business.

The Debtor needed to secure construction financing. He and Donnelly discussed with Mr. Stone, the Debtor's attorney at the time, potential financing options and Mr. Stone directed the Debtor to a mortgage company. The company was willing to make a loan to the Debtor after

the structure was framed and enclosed (the "First Phase"). Donnelly agreed to help the Debtor

complete this First Phase of the construction. Donnelly testified that he neither expected nor

asked for any compensation from the Debtor.  According to the testimony of Donnelly and the

Debtor, the Debtor did agree to reimburse Donnelly for any and all out-of-pocket expenses that

Donnelly incurred on behalf of the Debtor.  The Debtor testified that Donnelly was not liable for

any of the construction costs associated with the construction.

To finance the First Phase, the Debtor asked Donnelly whether he was aware of any

sources of financing. Donnelly on behalf of the Debtor approached Justin Fisher, who had

expressed to Donnelly an interest in investing in this type of venture.  Fisher agreed to advance

to the Debtor $100,000 ("First Loan").  Fisher testified that half of the funds he advanced were

from his sister, Jackie Mann and his brother-in-law Timothy Mann and Fisher provided the other

$50,000.  The Debtor executed a note dated November 13, 2003 ("Note") for $100,000 which

included a maturity date of June 27, 2004 and a $15,000 interest payment.  The Note does not

provide a specific rate of interest to be charged.  It states that "On June 27, 2004, after date, for

value received, I, Joseph T. Dimino [the Debtor], for value received, promise to pay to the order

of – Justin Fisher, Jackie Mann and Timothy [Mann] the sum of One Hundred Thousand Dollars,

with interest totaling $15,000.00.  If not paid on the date due, at the option of the holders of said

Note, legal proceedings can be instituted."  (Plaintiff's Trial Ex. 4).  The Note listed a due date of

"6-27-04." Id.

At trial, both Donnelly and Fisher testified that the intended interest rate of the loan was

to be 15% per annum.  The Debtor's testimony regarding the genesis of the interest rate

contradicted that of Donnelly and Fisher.   According to the Debtor, no interest rate was

discussed with regard to the Note, only that the loan was to be repaid with $15,000 in interest.

4

Further testimony from the Debtor revealed that he was uncertain as to what consequences, if any, would occur if he were unable to pay the Note by the maturity date, and whether interest would continue to accrue under the Note thereafter.

Donnelly testified that the loan proceeds were used to purchase construction materials to complete the framing and closing of the house, including the Tyvek, sheathing, windows, exterior doors and a roof.   Donnelly submitted evidence substantially corroborating this testimony. (See Defendant's Trial Ex. B).  Between December 2003 and March 2004, Donnelly and the Debtor spent an additional $7,320.37 on supplies required for completion of the First Phase.  Donnelly advanced some of these costs by charging the materials to his credit card which he testified carried an interest rate of approximately 24%.  The Debtor testified that he reimbursed Donnelly for these submitted expenses with proceeds derived from three mortgages that the Debtor placed on the Property.  According to the Debtor, these mortgages totaled $550,000.

On or around April 9, 2004, the Debtor received a second loan of $100,000 (the "Second Loan").   The proceeds from the Second Loan were used to finish the outside of the house with cedar shakes, to construct a wraparound mahogany porch, and for the rough plumbing and rough heating of the house.  Over and above the Second Loan, the Debtor and Donnelly incurred an additional $9,103.54 in expenses.  (Defendant's Trial Ex. C). These charges were made to their credit cards.   Donnelly testified that the Debtor never reimbursed him for these charges. The Debtor disputed this testimony, and he testified that he had repaid Donnelly for these expenses.

In June 2004, the Debtor decided to list the house for sale.  Donnelly testified that the Debtor was approached by a real estate broker who was interested in listing the house for sale upon completion of construction for $1.9 million.  Shortly after that time, the Debtor was

approached by an individual who offered to purchase the Property as is for approximately

$800,000.  The Debtor received an additional offer for $1.2 million sometime in late 2005.  The

Debtor did not accept any of these offers.

Donnelly became increasingly concerned that the Debtor was in financial difficulty.  By

May 2005, it appeared that a Certificate of Occupancy could be issued for the house.  Donnelly

had made an appointment to have the floors sanded and varnished in anticipation of applying for

the Certificate of Occupancy for the home.  The night before the work was to take place, the

Debtor called Donnelly and told him to "call off" the workers because the Debtor did not have

the funds to pay for the work.  As a result, Donnelly went to the house himself to finish the floors

and install kitchen cabinets, using his own funds to complete the work.  It was during this time

period that the Debtor approached Donnelly to inform him that he was contemplating filing for

bankruptcy.

There came a point in time when an individual named Bonnie Kamen expressed an

interest in purchasing the Property.  Kamen made an offer to purchase the Property for $750,000,

which the Debtor accepted.  When it appeared that Kamen was likely to purchase the Property,

Donnelly requested that the Debtor add Fisher's name to the closing documents as a payee of a

portion of the sale proceeds to ensure that Fisher received payment in full under the Note.

Although the Debtor had previously repaid $72,000 under the Note,  a total of $28,000 in

principal and $15,000 in interest remained due and owing under the Note.   The Debtor refused

to add Fisher's name as a payee under the closing documents.

A closing date of February 2, 2007 ("Closing Date") was fixed by the parties.  As the

Closing Date approached, the Defendants were concerned that they were still owed money from

the Debtor.  In December 2006, they decided to file mechanic's liens and record them on the

Property so that they could "bring [the Debtor] to the table" and discuss the Debtor's obligations to Donnelly and Fisher.  On December 11, 2006, Donnelly filed a mechanic's lien against the Property in the amount of $25,220 (Plaintiff's Trial Ex. 7).[1]  Fisher filed a mechanic's lien against the Property in the amount of $70,000 on December 22, 2006 (Plaintiff's Trial Ex. 8).[2]

In January 2007, Kamen's attorney discovered the existence of the two mechanic's liens. The Debtor's closing attorney did not believe that the mechanic's liens were valid  and he brought a proceeding  to have the liens extinguished.   However, he was unable to obtain an expedited decision from the court on the validity of the liens and he testified that his attempts to have a bond posted with the title insurance company were rejected .

Kamen proposed to increase her offer by $25,000 in order to settle and discharge the liens on the Property and expedite the closing.  She testified that she was under no time pressure to close on the purchase of the Property, and she was willing to delay the closing until the lien issue could be resolved. The Debtor, in his testimony, disputes this assertion.  He claims that the Property was sold for $750,000 and that nothing more was added to the purchase price.  The closing statement corroborates the testimony that the purchase price was $750,000. (Defendant's Trial Ex. A).  However, there is a glaring mathematical error in the closing document that shows payments in excess of $750,000 that could only be explained if Kamen's testimony is accurate.

As the Closing Date neared, the Debtor's attorney contacted the Defendants and offered Donnelly $15,000 and Fisher $40,000 in satisfaction of the mechanic's liens.  The Defendants accepted the offers.  At the closing, Donnelly was paid $15,000 and Fisher was paid $40,000 and each of the Defendants executed satisfactions of the mechanic's liens.

---

[1] The mechanic's lien that Donnelly filed sought $12,000 in labor costs and $13,220 for materials furnished in the construction of the house on the Property.  At trial, Donnelly confirmed that he was actually owed  $17,423.91 for the cost of materials he purchased.

[2] The mechanic's lien that Fisher filed indicated that the lien was for materials furnished for the construction of a single-family dwelling.

*Legal Analysis*

    *1.  First Cause of Action*

        The Trustee alleges in the first cause of action in his amended complaint that the  Pre-

Petition Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1).  Section 548(a)(1) states, in

relevant part:

> The trustee may avoid any transfer...of an interest of the debtor in property, or
> any obligation…incurred by the debtor, that was made or incurred on or within 2
> years  before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily--
>     (B)(i) received less than a reasonably equivalent value in exchange for such
> transfer or obligation;  and
>       (ii) (I) was insolvent on the date that such transfer was made or such
> obligation was incurred, or became insolvent as a result of such transfer or
> obligation….

11 U.S.C. § 548(a)(1) (2006).  To establish a claim for a constructive fraudulent transfer under §

548(a)(1)(B), "the plaintiff must allege facts showing that (i) the debtor had an interest in the

property; (ii) a transfer of that interest occurred within the prescribed time period; (iii) the debtor

was insolvent at the time of the transfer or became insolvent as a result thereof; and (iv) the

debtor received less than reasonably equivalent value in exchange for such transfer." Official

Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.), 343

B.R. 444, 468 (Bankr. S.D.N.Y. 2006) (citing BFP v. Resolution Trust Corp., 511 U.S. 531, 535

(1994)).

        In support of this cause of action, the Trustee alleges that the Pre-Petition Transfers by

the Debtor to the Defendants were made within two years of the Filing Date, that the Debtor was

insolvent when the Pre-Petition Transfers were made and that the Debtor received less than

reasonably equivalent value in exchange for the Pre-Petition Transfers.  Taking the $55,000

transferred by the Debtor at the closing first, the Trustee alleges that since the Defendants did not

have valid mechanic's liens on the Property, the Defendants had no legal right to the monies paid

at the closing, which transfers were made by the Debtor under duress.    As a result, the Debtor

did not receive reasonably equivalent value in exchange for the payments made at the closing

and the transfers are recoverable under Bankruptcy Code section 548(a)(1)(B).

The Defendants do not dispute that the transfers made at the closing were made within

two years of the Filing Date.  Furthermore, the Defendants do not dispute the Trustee's assertion

that the Debtor was insolvent or made insolvent by the transfers made to the Defendants at the

closing.  The Defendants also concede that  the mechanic's liens were defective.  However, the

Defendants assert that the payments made at the closing were not made under duress and were in

satisfaction of valid antecedent debts owed by the Debtor.  As a  result the Debtor  received

reasonably equivalent value from the Defendants in exchange for the transfers.

Section 548(d)(2)(A) of the Code provides, in part, that "'value' means…satisfaction…of

a present or antecedent debt of the debtor…." 11 U.S.C. § 548(d)(2)(A) (2006).  The "concept of

reasonably equivalent value has not been defined in the Code.... 'Congress left to the courts the

obligation of marking the scope and meaning of [reasonably equivalent value].'" Mellon Bank,

N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139,

148 (3d Cir. 1996) (quoting Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC,

Inc.), 914 F.2d 458, 466 (4th Cir. 1990)).  The Trustee has the burden of proof in establishing

that the Defendants received less than reasonably equivalent value.  In re Bayou Group, LLC,

396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008).

Whether a transfer is for "reasonably equivalent value" is largely a question of fact, the

determination of which "depends on all the circumstances surrounding the transaction."

American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp., 351 F.Supp. 2d 79, 105-

106 (S.D.N.Y. 2004); <u>Jackson v. Mishkin</u> (<u>In re Adler, Coleman Clearing Corp.</u>), 263 B.R. 406, 466 (S.D.N.Y. 2001); <u>see also</u> <u>Davis v. Suderov</u> (<u>In re Davis</u>), 148 B.R. 165, 175 (Bankr. E.D.N.Y. 1992), <u>aff'd</u> 169 B.R. 285 (E.D.N.Y. 1994) (stating that the courts in this district have opted for a case-by-case analysis).  Moreover, "the determination of whether the debtor received reasonably equivalent value for his interest requires the court to compare what was given with what was received." <u>Pergament v. Reisner</u> (<u>In re Reisner</u>), 357 B.R. 206, 211 (Bankr. E.D.N.Y. 2006) (quoting <u>Coan v. Fleet Credit Card Servs., Inc.</u> (<u>In re Guerrera</u>), 225 B.R. 32, 36 (Bankr. D. Conn. 1998)).  "It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange in order to establish reasonably equivalent value." <u>Id.</u>  Courts examine the "totality of the circumstances" of the transfer to determine whether "reasonably equivalent value" was given by the transferee. <u>In re Aphton Corp.</u>, 423 B.R. 76, 89 (Bankr. D.Del. 2010). In general, where a transfer is made to pay an antecedent debt, the transfer does not constitute a constructive fraudulent conveyance. <u>Id.</u> (citing inter alia, <u>In re APF Co.</u>, 308 B.R. 183 (Bankr. D.Del. 2004); <u>In re Rosen Auto Leasing, Inc.</u> 346 B.R. 798 (B.A.P. 8th Cir. 2006); and <u>Atlanta Shipping Corp. v. Chemical Bank</u>, 818 F.2d 246, 249 (2d Cir. 1987) (repayment of an antecedent debt constitutes fair consideration unless the transferee is an insider) (other citations omitted).

      a.    Satisfaction of the Mechanic's Liens

The record before the Court supports a finding that the Debtor received reasonably equivalent value in exchange for the transfers made at the closing.  Both Fisher and Donnelly had placed mechanic's liens on the Property which the Defendants concede were legally defective.  However, the Debtor had the right to seek discharge of the liens in a legal proceeding after posting a bond to ensure a closing on the Property.  Nonetheless, the Debtor chose to settle with the Defendants by paying the Defendants a portion of the net sale proceeds at the closing.

Based on that settlement, the Defendants gave up any rights they may have had as mechanics lienors and on the underlying obligations that were the basis for the liens.

The Trustee asserts that the Debtor's agreement to settle with the Defendants is void as it was made under duress.  Under New York law, a contract may be voided as a result of duress if the party claiming duress can prove that he was "involuntarily forced" to act because of "a wrongful threat precluding the exercise of…free will." Warnaco, Inc. v. Farkas, 872 F.2d 539, 546 (2d Cir. 1989) (other citations omitted).  The party claiming duress must show more than that a party is exercising his or her legal rights. Davis & Assoc., Inc., v. Health Mgmt. Servs., 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001).  There can be no claim of duress in entering a settlement where a party has the alternative of refusing to settle and pursue his or her legal claims. Batac Dev. Corp. v. B & R Consultants Inc., 1999 WL 76873, at *4-5 (S.D.N.Y. Feb. 16, 1999).  In this case, the Debtor always retained the right to seek relief in state court, and he in fact filed a complaint against the Defendants to have the mechanic's liens removed.  The Debtor has produced no evidence that his free will was affected by the Defendants actions, so as to leave him with only one choice -  to settle with the Defendants by paying them at the closing in satisfaction of the mechanic's liens.  Rather, the record supports a finding that the Debtor's agreement to pay the Defendants a portion of the sale proceeds in satisfaction of the mechanic's liens was a bargained-for exchange between the parties.  The mere fact that the Debtor felt pressure to clear title to the Property by the Closing Date does not, by itself, dictate a conclusion that the settlement is void as a product of duress.

  b.  Antecedent  Debt owed to Donnelly

The record also reflects that Donnelly used at least $17,423.91 of his funds to purchase materials for the construction of the house for which he received no payment prior to the closing.

11

The Debtor's $15,000 transfer to Donnelly at the closing was in satisfaction of this antecedent debt.   These transfers made on the Closing Date to the Defendants to extinguish the mechanic's liens are properly viewed as payments for these valid antecedent debts of the Debtor.  Taking into account the foregoing, the Court holds that the Debtor paid reasonably equivalent value for the loan by Fisher and the purchase of goods by Donnelly.

The Trustee claims that Donnelly forfeited any right to receive payment from the Debtor for the goods and materials he furnished because he was not licensed to perform home improvements, and therefore the Debtor owes no antecedent debt to Donnelly.  Pursuant to the Suffolk County Code, New York State law and case law, a "home improvement contractor" who is unlicensed forfeits the right to recover damages based on either breach of contract or quantum meruit, as well as the right to foreclose on a mechanic's lien. Ben Krupiniski Builder and Assoc., Inc. v. Baum, 828 N.Y.S.2d 583, 584 (App. Div. 2007); see also Callos, Inc. v. Juilianelli, 752 N.Y.S.2d 398, 398-399 (App. Div. 2002) (granting defendant's motion for summary judgment on the basis that the plaintiff was not licensed to perform home improvements).  However, the Debtor was not indebted to Donnelly based on his work performed as a "home improvement contractor."  Rather, the debt between the Debtor and Donnelly arose as a result of Donnelly's purchase of goods and materials for the Debtor's benefit.

Section 770(4) of the General Business Law states that a home improvement contractor is someone who agrees to perform for "a fee." N.Y. Gen. Bus. Law § 770(4) (McKinney 2001). Donnelly did not charge the Debtor a fee for his services.  He worked on the construction of the house on the Property as a volunteer, and he neither expected nor agreed to receive any compensation for the work he performed. The $15,000 transfer by the Debtor was in satisfaction of actual costs incurred by Donnelly for materials only.

12

Donnelly did not forfeit his right to the $15,000 under the relevant Suffolk County Code provisions either.  According to the Suffolk County Code, "[I]t is unlawful for any person to engage in *any business* as a home improvement contractor without obtaining a license therefor from the office in accordance with and subject to the provisions of [Article II of § 345 of the Suffolk County Code] and Article I [of § 345 of the Suffolk County Code]." Suffolk County Code § 345-17(A) (emphasis added).  The Suffolk County Code provides that "business" includes "occupation, profession, trade, craft or any other calling for hire." Suffolk County Code § 345-2.  Donnelly was not in the "business" of working as a home improvement contractor.  He was a postal worker who volunteered to assist the Debtor at the Debtor's request, and he did not seek payment for his labor.

In sum, the antecedent debt owed by the Debtor to Donnelly was valid and was supported by Donnelly's testimony and documentary evidence.  Therefore, the Debtor's transfer of $15,000 to Donnelly at the closing was in exchange for the reasonably equivalent value of the out-of-pocket expenses previously incurred by Donnelly for the benefit of the Debtor.

        c.    Antecedent Debt owed to Fisher

The Trustee acknowledges that the Debtor received $100,000 pursuant to the Note and the Debtor repaid a  total of $100,000 in principal and $12,000 in interest under the Note.  The Trustee does not challenge that the Debtor's transfer of $112,000 constitutes reasonably equivalent value for the receipt of  the First Loan proceeds.  The Trustee challenges the validity of the Note itself and argues that because it is unenforceable under New York law, there was no valid antecedent obligation owed by the Debtor to Fisher .  According to the Trustee, the interest rate under the Note exceeds 25% and as a result, the Note is void under the relevant usury

13

statutes.   Fisher asserts that he had no intention to charge or receive interest in excess of  15%

per annum.

Both parties agree that New York's civil usury laws prohibit a lender from charging

more than 16% interest on a loan, subject to certain exceptions. See N.Y. Gen. Oblig. Law § 5-

501 (McKinney 1989); N.Y. Banking Law § 14-a (McKinney 1990).  Further, they both agree

that charging an interest rate in excess of 25% per annum constitutes criminal usury and is a

felony under New York's penal law. Penal Law § 190.40 (McKinney 1998).  A loan that violates

the civil usury statute is void pursuant to § 5-511 of New York General Obligations Laws. In re

Venture Mortgage Fund, LP, 282 F.3d 185, 187 (2d Cir. 2002).

Case law is clear that courts are not inclined to find that a loan violates the civil usury

statutes because the penalty of forfeiture of both principal and interest is so steep.  In re General

American Commc'ns Corp., 73 B.R. 887, 891 (S.D.N.Y. 1987) (citing Freitas v. Geddes Sav.

and Loan Ass'n, 471 N.E.2d 437, 442-442 (1984).  Under both civil and criminal statutes, the

relevant test is whether the lender "knowingly charges, takes or receives" money at or above the

prohibited interest rate.  Penal Law § 190.40 (McKinney 1998); See Hammond v. Marrano, 451

N.Y.S.2d 484, 485 (App. Div. 1982).  The party asserting usury has the burden of proving the

elements by clear and convincing evidence.  Freitas 471 N.E.2d at 442.  "A loan is usurious if the

lender intends to take and receive a rate of interest in excess of that allowed by law even though

the lender has no specific intent to violate the usury laws." Hammond, 451 N.Y.S.2d at 485.

Once a note bearing a usurious interest rate is introduced into evidence, the burden shifts to the

opposing party to introduce evidence negating the existence of usury.  Venture Mortgage Fund,

282 F.3d at 185.

It is a question of law for the Court to determine whether the Note itself is ambiguous, and thus whether, under the general rule, any proffered extrinsic evidence will be excluded or admitted and considered in determining whether the Note charges a usurious amount of interest. South Road Associates, LLC v. Int'l Business Machines Corp., 826 N.E.2d 806, 809 (N.Y. 2005).  A contract is unambiguous if the chosen language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-171 (N.Y. 2002) (citing Breed v Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)).  In this case, the Court finds that the terms of the Note are ambiguous and it is appropriate to consider the testimony of the Debtor as obligor and Fisher as obligee in order to interpret the Note.  Furthermore, even if the Court were to find that the interest rate under the Note exceeded 16% as drafted, Fisher has introduced sufficient evidence to rebut the presumption that he had the requisite intent to charge interest at a rate in excess of 16% per annum.

While the Note clearly states the amount loaned and the dollar amount of "interest" to be charged, it fails to state other material terms which would compel the Court to find that the interest rate charged under the Note is usurious. The Note states that the Debtor promises to pay Fisher, Jackie Mann and Timothy Mann (collectively, the "Lenders") $100,000 with "interest" totaling $15,000. (Plaintiff's Trial Ex. 4).  November 13, 2003 is the execution date of the Note and the stated due date is June 27, 2004. Id.

The Note does not provide an actual rate of interest and it fails to provide for a default rate of interest or any default provisions at all in the event the Note was not timely paid.  The $15,000 interest provision could be a one-time charge which is payable whenever the Note is

repaid, regardless of the due date, or it could constitute an interest charge in excess of the civil usury statutes.   Furthermore, the Note does not specify whether the interest is to be repaid to one of the Lenders or all of the Lenders.

The ambiguous nature of the Note is highlighted by the Trustee's own conduct in the Debtor's case.  The Trustee commenced this adversary proceeding seeking a determination that the Note on its face is usurious and  the Trustee brought a similar action  against Jackie Mann to recover the payments she received under the Note as well.   (Adv. Pro. No. 809-8176-reg).  However, the Trustee ultimately discontinued the action against Jackie Mann with prejudice because "she had no knowledge of the promissory note at issue and was not actually repaid a criminally usurious amount of interest on the underlying note from the  . . . Debtor."   (Adv. Pro. No. 809-8176-reg, docket no. 8).   It appears that the Trustee is treating the Note as a divisible instrument, and  is asserting that the terms are usurious as to one of the Lenders and not as to the other Lenders.  Without commenting on the propriety of treating the Note as a divisible instrument, these two positions are at odds with each other.  The Note on its face does not specify which of the  Lenders are to be repaid the interest, yet the Court is  asked to conclude that Fisher intended to charge interest in excess of 16%.  There is no consistent legal explanation for the Trustee's willingness to absolve  Mann of  usury while  pressing the same claim against Fisher under the same Note.   Because it is clear that the terms of the interest payment can be interpreted in more than one fashion, there is sufficient ambiguity to permit the Court to consider extrinsic evidence to determine the intent of the parties on this issue.

The relevant testimony indicates that Fisher had  no intent  to charge interest in excess of 16%.  In his testimony, Fisher stated that he discussed the terms of the loan with the Debtor and they understood the interest rate to be for 15% per year.  Donnelly also testified that the parties

intended to charge interest at 15% per annum.  He stated that the parties arrived at this rate

because it was the interest rate that other private lenders were offering the Debtor for an

unsecured loan.  In contrast, the Debtor's testimony on this issue lacked credibility and was

inconsistent.  The Debtor could not state for certain what interest rate was to be charged, and  he

testified at various times that the interest rate of the Note was intended to be 15% per year, or

that the $15,000 payment was the maximum due whenever the Note was repaid, or that the

$15,000 was due on the maturity date.  Taking the testimony of the Defendants and the Debtor

into account, and giving the appropriate weight to the testimony,  the Court finds that Fisher did

not intent to charge the Debtor interest in excess of 16% per year.

This finding is supported by the conduct of the parties.  Three years after the Note was

executed, a total of $72,000 had been collected on the Note and none of the Lenders demanded

interest on the Note in excess of 15% per annum.  The Debtor confirmed this testimony by

stating that he was never contacted by the Lenders seeking interest in excess of 15% per annum.

The Debtor paid the Lenders a total of $112,000 on the Note through the Closing Date.   Based

on the total  payments made by the Debtor, the actual interest rate charged by Fisher  was

substantially less than 15%, and does not even approach a usurious rate.  Even if the Debtor had

paid Fisher the entire amount Fisher sought pursuant to the mechanic's lien, the total amount of

interest charged under the Note amounted to less than 16% per annum. Therefore, the Court

concludes that the Note is not void under the applicable usury laws because Fisher never

intended to charge and did not collect interest in excess of 16% per annum.

Based on this conclusion, the $10,000 transfer by the Debtor to Fisher before the closing

was also made on account of a valid, antecedent debt owed by the Debtor.  Since the debts owed

to the Defendants were valid and enforceable and since the Pre-Petition Transfers were of

17

reasonably equivalent value in relation to the debts owed to the Defendants, the Court dismisses

the first cause of action for failure to establish a prima facie claim.

    *2.  Second Cause of Action*

      The Trustee's second cause of action in his amended complaint alleges that the Trustee is

entitled to judgment avoiding the Pre-Petition Transfers pursuant to 11 U.S.C. § 544(b)(1) and

DCL § 273.  DCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will
> be thereby rendered insolvent is fraudulent as to creditors without regard to his
> actual intent if the conveyance is made or the obligation is incurred without a fair
> consideration.

N.Y. Debt. & Cred. Law § 273 (McKinney 1996).  The burden of proving constructive fraud

under the DCL is generally on the party seeking to set aside the transfer, and that party must

prove the elements set forth in the statute by a preponderance of the evidence. In re Jacobs, 394

B.R. 646, 662 (Bankr. E.D.N.Y. 2008).  Further, § 272 of the DCL provides:

> Fair consideration is given for property, or obligation,
> a. When in exchange for such property, or obligation, as a fair equivalent therefor,
> and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present
> advance or antecedent debt in amount not disproportionately small as compared
> with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. Law § 272 (McKinney 1996).  The Second Circuit has stated that "where…a

transferee has given equivalent value in exchange for the debtor's property, the statutory

requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive

knowledge of any fraudulent scheme." HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 (2d Cir.

1995).  For the same reasons as set forth above, the Court finds that the Pre-Petition Transfers

were made in exchange for fair consideration.  Therefore, the Trustee has failed to establish a

prima facie case under the second cause of action under DCL § 273 and the second cause of action is dismissed.

### 3. *Third Cause of Action*

The Trustee's third cause of action in his amended complaint alleges that the Trustee is entitled to judgment against Donnelly and Fisher directing them to return and account for the Pre-Petition Transfers pursuant to §§ 541(a) and 542 of the Code.  However, the Pre-Petition Transfers are not property of the estate because the Prepetition Transfers are not avoidable under applicable law.  As a result, the Trustee is not entitled to a return of the Pre-Petition Transfers and this cause of action is dismissed.

### 4. *Fourth Cause of Action*

The Trustee's fourth cause of action in his amended complaint alleges that the rate of the Note was criminally usurious pursuant to applicable New York law and is therefore void ab initio.  Further, the Trustee argues that, pursuant to § 541(a) of the Code, the Trustee is entitled to judgment against Fisher for the amounts  that the Debtor paid to Fisher prior to and at the closing on the Property.  For the reasons discussed above, the Note is not criminally usurious and is not void.  Therefore, the fourth cause of action is dismissed.

### 5. *Fifth Cause of Action*

The Trustee's fifth cause of action in his amended complaint alleges that the interest rate of the Note was in excess of the rate permitted pursuant to New York General Obligations Law § 5-501.  Therefore, pursuant to § 5-513 of the General Obligations Law, the excess interest paid above the legal limit must be forfeited and turned over to the Trustee.  As this Court has stated above, the terms of the Note did not violate § 5-501 of the General Obligations Law and the

Trustee is not entitled to recover any interest paid to Fisher under the Note.  Taking the foregoing

into account, the fifth cause of action is dismissed.

***Trustee's Motion for Summary Judgment***

Prior to the trial, the Court heard oral argument on the Trustee's motion for summary

judgment against the Defendants and marked the matter submitted.  Based on the Court's

findings, the Trustee is not entitled to judgment as a matter of law and the motion for summary

judgment is denied.

A judgment consistent with this ruling will issue forthwith.

Dated: Central Islip, NY                                        By ***/s/ Robert E. Grossman***
      April 21, 2010                                              Robert E. Grossman
                                       United State Bankruptcy Judge